[No. 2669.]

JAMES STANLEY v. THE STATE.

MURDER—FACT CASE.—See evidence held sufficient to sustain a verdict of murder in the first degree, with death penalty.

APPEAL from the District Court of Colorado. Tried below before M. Kennon, Esq., Special Judge.

The indictment charged the appellant with the murder of R. L. Strickland, in Colorado county, Texas, on the twenty-seventh day of November, 1882. He was convicted of murder in the first degree, and was awarded the death penalty.

Lewis Brooks was the first witness introduced by the State. He testified that he knew the defendant as Jim Stanley, and identified him in court. He knew the deceased in his life time. The deceased, at the time of his death, was keeping a little store on his mother's farm, in Colorado county, about eight miles from the town of Eagle Lake. The witness was then living on a farm, about five hundred yards from the store.

On the Sunday before he was killed, the deceased told the witness to come to the store next day and assist him to sack a quantity of pecans. The witness went to the store next day, which was Monday, November 27, 1882, in deference to this request, and when he arrived he found the defendant, Jim Stanley, Harry Riggins and Pratt at the store. While at the store on that day the witness heard the defendant say that he did not know what he would do if it did not stop raining, as he had no money with which to buy provisions. While the defendant, Riggins, Pratt and the witness were at the store on that morning, the deceased took some money out of the drawer and put it in a shot sack, saying: "Look here, boys, how much money I have made in the last few days. I am going to take it to my mother. My brother will come after it." The sack contained silver and currency, and was about half full. After showing this money the deceased put it in a trunk and locked it up. The defendant asked the deceased when his brother was coming for it, and the deceased replied that he would come "to-day or to-morrow."

Jeff. Lewis was at that time employed by the witness in pick-ing cotton. He, Jeff. Lewis, was not at the store when the de-ceased exhibited the money and locked it in the trunk. The defendant lived with Doug. Thomas, about one mile from the store. Witness got to the store about twelve o'clock that day, and it was early in the evening when he and deceased finished sacking the pecans and witness left. When witness left, the defendant, Riggins and Pratt were at the store. Witness went by the store again late that evening, at which time Jeff. Lewis, the defendant and the deceased were the only persons at the store, and at about nine or ten o'clock that night Jeff. Lewis came to the house of the witness, where he was then living and had been living and sleeping for two or three weeks. Witness promised them to take some potatoes to the store that night.

On the next day, November 28, 1882, the witness went to the store of the deceased to get some meat. This was about one o'clock. A man and little boy were there at the store, with a sack of pecans. Witness found the store closed and the door locked, and supposed that the deceased was inside asleep. He knocked at the door and called the deceased, but received no answer. He then went around to the window and found the blinds closed. He then got on a barrel and looked through a crevice, and he saw the deceased lying on a bed. He called to the deceased but received no answer. Looking closer, the witness saw that the deceased's head and clothes were very bloody. Witness then told the people what he discovered in the room, looking through the crevice, first dispatching a messenger to the deceased's brother Walter, who was in Eagle Lake at the time. Walter Strickland arrived after a time and had the store door broken open. Witness went in and found the deceased lying on his bed, with his head cut open. The appearance of the wounds indicated that one blow had been struck with the back of an ax, as the print of the eye of an ax was plainly discernable on the top of the forehead. Another blow on the head, made with the sharp edge of the ax, had split the skull open. A part of the deceased's skull was lying on a table near the bed, and brains were scattered over the bed, and a large quantity of blood on the floor. The wounds described caused the death of the deceased. The store door was not opened until Walter Strickland arrived.

Jeff. Lewis returned to the house of the witness, where he slept, at about nine or ten o'clock on the night of the killing.

He ate breakfast at the witness's house next morning, and went to picking cotton. He also ate his dinner at the witness's house that day. He was picking cotton when the witness told him of the murder, and quit picking as soon as informed. The witness had lived in the neighborhood for a number of years, and had never heard of a man in that neighborhood named Lee Lewis, other than the brother of Jeff. Lewis, who was now in the court house. The witness was positive that the defendant was the man he saw at the store of the deceased on the day of the murder of R. L. Strickland. He had not seen the defendant since that day until this trial. Deceased was killed in Colorado county, Texas, on the night of November 27, 1882. Jeff. Lewis was not at the store when the deceased showed the money to the defendant, witness, Riggins and Pratt, and put it in the trunk.

Walter Strickland was the next witness for the State. He testified that he and the deceased were brothers, and in November, 1882, were engaged in mercantile pursuits on their mother's farm in Colorado county, eight or nine miles from Eagle Lake. Witness left the store to go to Eagle Lake on the evening of Saturday, November 25, 1882, which was the Saturday before the murder. He was on his way back to the store from Eagle Lake on November 28, 1882, which was the day after the killing was done, when he met some one who had been sent to inform him of the murder. He rode rapidly to the store, reaching it about two o'clock p. m., and found the doors closed and locked. Witness directed Mr. Pink Anderson to break the door down, which being done, the witness went in and found his brother dead in bed; his head split open, brains scattered over the bed, blood over the floor, and a fragment of his skull lying on a table near the bed. He had been stricken once near the top of the forehead with the back of an ax, the print of the eye of which was plainly visible. Another blow, the sharp edge of the ax being used, had split the skull open.

When the witness left the store on the preceding Saturday, he left some fifty or sixty dollars in silver and currency in the care of the deceased. On his return on the day mentioned, he found but five dollars in the store. On his return that day the witness found the trunk in which he and his brother customarily kept their money broken open, and he could find neither the key to the trunk nor to the store. The deceased was locked up in the store. Witness and his brother kept an ax at the store. Witness had never seen it since he found the dead body of his

brother. Near the bed on which the deceased was killed the witness found a pair of bloody low-quartered shoes, which shoes he turned over to Mr. Townsend, sheriff of Colorado county. The shoes in court are those he found at that place and time. Witness also found a pair of bloody " overalls " at the house of Doug. Thomas, where the defendant lived at that time. Deceased was sixteen years old at the time of his death.

The witness had lived on his mother's farm in that neighborhood for many years, and had kept that store for a long time. He knew all the negroes in that part of the country. Except the brother of Jeff. Lewis, now in the court, the witness had never known or heard of a man named Lee Lewis. Had there ever been another Lee Lewis in that section, the witness would have known him. Witness identified the defendant as Jim Stanley, whom he knew and had seen several times.

Jeff. Lewis was the next witness for the State. He testified that he had been picking cotton for, and living on the farm of, Lewis Brooks, near the store of the Stricklands, for five or six weeks, when the deceased was murdered. The defendant at that time was living with and picking cotton for Doug. Thomas, who lived about a mile from the store. Witness picked cotton on the Brooks place, on November 27, 1882, until quite late in the evening—nearly night—after which he went to the store of the deceased, about one hundred yards distant from the cotton patch. The deceased and defendant were the only parties at the store when the witness arrived. Witness had been there but a few minutes when Lewis Brooks came by on his way home, stopping and telling the deceased that when he got through work that night, he would bring the deceased a sack of potatoes. Witness waited at the store until nine or ten o'clock that night for Lewis Brooks, but Brooks did not come, and witness went home (to Brooks's house) by himself.

The defendant cooked supper for the deceased and himself at the store that night, after eating which the defendant said, in the presence of the witness, that he wanted to hire, and the deceased replied that he would hire him. When the witness left the store that night, he left the defendant and the deceased together. He asked the defendant, who had an ax and was cutting wood, to go home with him. The defendant declined, saying that he was going to stay with the deceased that night, and was then cutting wood to keep up a good fire. Deceased remarked to the witness: "Yes, Jim Stanley is going to stay

with me to-night." The witness left no one at the store that night but the defendant and the deceased.

It was about nine or ten o'clock that night when the witness went home to the house of Mr. Lewis Brooks, where he had been living for five or six weeks. After breakfast next morning the witness went to the cotton patch and picked cotton until noon. After dinner he returned to the cotton patch and picked cotton until about two o'clock, when he was informed by Henry Sherfield and Mrs. Brooks of the murder of the deceased, when he quit. This was on the twenty-eighth day of November, 1882. Witness knew the defendant, Jim Stanley, and knew that he was the only person besides the deceased he left at the store at ten o'clock on the night of November 27, 1882.

Harry Riggins next testified for the State. He knew the defendant, and saw him at the Strickland store on the twenty-seventh day of November, 1882. Lewis Brooks, defendant, Pratt and the witness were at the store about twelve o'clock on that day. Brooks was helping deceased sack pecans. The witness saw the deceased take some money out of a drawer, put it in a shot bag, and then in a trunk which he locked. As he put the money from the drawer into the bag deceased exhibited the bag, which seemed to be about half full, and said: "Look here, boys, how much money I have made in the last few days. My brother is coming after it to take it to my mother." Defendant asked: "When is your brother coming after the money?" Deceased replied: "To-day or to-morrow." Defendant then remarked that he did not know what he would do if it did not stop raining, as he had no money with which to buy provisions. Defendant tried to sell the witness a pistol, saying he had no money. Witness did not buy it.

Doug. Thomas testified, for the State, that he knew the defendant on trial. At the time of the murder of young Strickland the defendant was picking cotton for the witness, and living with him on his place about one mile from the Strickland store. He had then worked for the witness some two or three weeks, and, with Lee Edmunds and others, slept in the cotton house. He left the house of the witness on Monday morning, November 27, 1882, and the witness saw no more of him until next morning about daylight, when he, witness, was at his lot feeding his stock. Defendant came to the witness at that time and said: "Doug., how much do I owe you? I want a settlement." Witness replied: "Jim Stanley, what is the matter?"

Defendant then said: "I am going to leave, and you may never see me again." He then went to the house and handed the wife of the witness a silver dollar through the window, to give to the witness's sister. He then left, without waiting for his breakfast.

The witness recognized the shoes in court as the property of the defendant. He had seen the defendant wear them often. Defendant appeared to be in a "hurrah," and uneasy, on the morning after the killing when the witness saw him at the stock lot. Witness had been boarding the defendant while in his employ. He owed the witness about twelve dollars, for which the witness took his pistol as the best he could do.

Lee Edmunds, for the State, testified that he and the defendant slept in the cotton house of Doug. Thomas while they were picking cotton for Thomas. Defendant did not sleep there on the night that young Strickland was killed. Witness saw him early next morning talking to Doug. Thomas, and heard him say that he was going away. The low-quartered shoes exhibited in court belonged to the defendant. The witness knew them well. He, defendant, wore them to a dance on the Friday night before the murder, and, having bursted them at the dance, came by Strickland's store on the next morning and left them.

Malinda Woodridge testified, for the State, that she and the defendant's mother lived on the Buck Carleton farm, about two miles from Columbus, when the murder of young Strickland occurred. Carleton's farm was about twenty miles from Strickland's store. Defendant came to the house of the witness late on the evening of November 28, 1882, the day after the killing, and brought with him about forty or fifty dollars.

Adolph Seftenburg testified that he was a merchant in Columbus, Texas, from which the town of Eagle Lake is about twenty miles distant. Defendant came into the store of witness "on the night, and about nine o'clock," and bought from the witness an overcoat, pair of shoes, hat and valise, his purchases amounting to twenty or twenty-five dollars, which he paid.

Larry Gay testified, for the State, that he saw the deceased at the depot in Columbus on the night of November 28, 1882, waiting for the west bound train. He had a valise with him. He showed the witness a twenty dollar gold piece and asked witness to change it.

J. L. Townsend, sheriff of Colorado county, testified, for the State, that on the night of November 28, 1882, he was notified

that a murder had been committed in Colorado county, below Eagle Lake. He went to the depot to take the east bound train for Eagle Lake, and saw defendant at the depot, and a little later saw him take the west bound train. Witness did not then know that the defendant was the suspected assassin. Witness went to the Strickland place and found the deceased, killed in the manner described by other witnesses. After investigating the matter witness started in pursuit of the defendant, having obtained a minute description of him from a negro woman. Arrived at San Antonio, he communicated the description to a policeman, who shortly effected the arrest of defendant and confined him in jail. Defendant was readily picked out of other prisoners confined in the San Antonio jail, by the witness. He asked the witness why he was arrested. Witness replied: " There has been a murder committed in the bottom below Eagle Lake, and you were in the neighborhood at the time." He further said to defendant: "Now, Jim, I warn you in time that anything you say, or statement you make, can be used as evidence against you, but not for you. Now you need not open your mouth or say a word unless you want to." Witness did not tell him who had been killed. The defendant replied: " Mr. Townsend, I am not the man that killed Robert L. Strickland, and don't know anything about it." The witness took eleven silver dollars from the defendant, and left him in jail until morning.

On the next morning the witness got a hack to take the defendant to the depot, thence to Columbus. In the hack, en route to the depot, the defendant said to the witness: " I want to tell you about the killing." Witness replied with the same admonition quoted above. Defendant replied: " Mr. Townsend, I did not kill the deceased, but I know who did and will tell you in time. There was a man come to me the night the deceased was killed, and said to me: 'Jim, I know where we can get some money; and if you will go with me I will go in and get the money and give you half.' I went with the man and stood out about thirty yards from the store and watched while the other man went in and got the money, and came out and gave me thirty dollars. The eleven dollars you got from me last night is Robert L. Strickland's money; and I knew from the treatment he gave deceased that deceased could not live."

The motion for new trial complained of error in refusing the defendant a continuance; of the admission of the testimony of

U

Townsend as to the declarations of the defendant; of the charge of the court, and of the verdict as unsupported by law or evidence.

No brief for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE.  Upon a careful consideration of the evidence, we are of the opinion that it establishes, beyond all reasonable doubt, that the defendant deliberately and cruelly murdered Robert L. Strickland; that the murder was committed in the night, in a store house, and while the deceased, a lad about sixteen years of age, was in his bed, and, in all probability, asleep.  An ax was the weapon used to effect this horrible deed, and with this deadly instrument the boy's head was mangled and cut open.

To get possession of a sum of money which the defendant knew was in the house and in charge of the deceased, was the motive which actuated the deed.  It was a murder most foul, and, unquestionably, from the evidence, the defendant was the perpetrator of it.  We find no error in the proceedings resulting in his conviction.  A most admirable charge was given to the jury by the learned special judge who presided at the trial.  It was full, clear, impartial, and in every particular correct.  In their discretion, the jury assessed the punishment to be inflicted upon the defendant at death, and, in our judgment, this extreme penalty is well justified by the atrocity of the defendant's crime.

The judgment of conviction is in all things affirmed.

*Affirmed.*

Opinion delivered June 2, 1883.